UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GARY W. SGOUROS, on behalf of himself and all others similarly situated,<br><br>   Plaintiff,<br><br>   v.<br><br>TRANSUNION CORP., TRANS UNION LLC, and TRANSUNION INTERACTVE, INC.,<br><br>   Defendants. | No. 14 C 1850<br>Judge James B. Zagel |

**MEMORANDUM OPINION AND ORDER**

  Plaintiff Gary Sgouros ("Plaintiff") brings this putative class action against Defendants TransUnion Corp. ("TU Corp"), Trans Union LLC, and TransUnion Interactive, Inc. ("TransUnion Interactive") (collectively, "Defendants") for (i) willful violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681g(f)(7)(A) and § 1681e(b), (ii) violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 § 2, and (iii) violation of Missouri Merchandizing Practices Act ("MMPA"), Mo. Rev. Stat. § 407.010. This matter is now before the Court on Defendants' motion to compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* and to order arbitration of Plaintiff's claims on an individual basis. Additionally, Defendants file a motion to dismiss under Fed. R. Civ. P. 12(b)(3) on the basis that Plaintiff initiated the suit in a wrong venue as his claims are subject to arbitration. For the following reasons, I deny both motions.

**I. FACTUAL BACKGROUND**

  On June 10, 2013, Plaintiff purchased a TransUnion Consumer Credit Score, known as a 3-in-1 Credit Report, Credit Score & Debt Analysis, for $39.99 on Defendant TransUnion Interactive's website. In order to buy a credit score, web users were required to

1

start by clicking a large orange "Click Here" button on the homepage below a banner that states, "Get Your Credit Score & Report." Once users click the button, a page with a header, "Your FREE credit score & $1 credit report are only moments away," appears.

*The Three-Step Credit Score Purchase Process*

1. Step One of Three

The webpage has three tabs, labeled "Step 1 of 3," "Step 2 of 3," and "Step 3 of 3." Amongst the three, only "Step 1 of 3" is colored in turquoise green and the other two tabs are in grey. The "Step 1 of 3" page requires users to give their basic information: user name, address, email address, last four digits of social security number, date of birth, and an option button where users must choose either "Yes" or "No" for the statement that reads, "Please send me helpful tips & news about my service, including special offers from TransUnion and trusted partners!" Underneath the option button is a large orange button which reads "Submit & Continue to Step 2." Users must click this button to proceed to the "Step 2 of 3" page.

2. Step Two of Three

Once users click the "Submit & Continue to Step 2" button, they are directed to a page where the second tab is now in turquoise green while the other two tabs—"Step 1 of 3" and "Step 3 of 3"—are in grey. This page requires users to enter their credit card information (card number, security code, and expiration date) and create their accounts by making a user name and password and selecting a secret question and providing the answer for the question. Underneath the text entry boxes to enter the information above, there is an option button to choose either "Yes" or "No" to the question: "Is your home address the same as your billing address?"

Below this option button is a scrollable text window ("the Window"). Inside the Window, users can see a phrase, "Service Agreement" ("the Agreement"), at the top left corner of the Window and the first sentence of the Agreement. Without scrolling down the

Window, users can see the following:

> Service Agreement
>
> Welcome to the TransUnion Interactive web site, membership.tui.tansunion.com, (the "Site"). This Service Agreement ("Agreement") contains the terms and conditions upon which you ("you" or the "member") may access and use . . .

Immediately below this Window is a hyperlink, labeled as "Printable Version," ("the Printable Version link") which links to the full text of the Agreement. The words "Printable Version" are in a font slightly smaller than other letters on the page, but are in green and accompanied by a graphic of a printer to its immediate right. Underneath the hyperlink is a paragraph which reads as follow:

> You understand that by clicking the "I Accept & Continue to Step 3" button below, you are providing "written instructions" to TransUnion Interactive, Inc. authorizing TransUnion Interactive, Inc. to obtain information from your personal credit profile from Experian, Equifax and/or TransUnion. You authorize TransUnion Interactive, Inc. to obtain such information solely to confirm your identity and display your credit data to you.

Finally, immediately below this paragraph ("the Authorization Paragraph") is a large orange button ("the Button") that reads, "I Accept & Continue to Step 3." Users must click the Button in order to proceed to the "Step 3 of 3" page. However, they need not scroll down to the bottom of the window to click the Button and proceed. Once users click the Button, they are directed to the "Step 3 of 3" page. The layout of the "Step 3 of 3" page is immaterial to the present dispute.

*Alleged Violation and Dispute*

Plaintiff learned from a lender that the credit score that he purchased on Defendants' website was inaccurate as it was more than 100 points lower than the credit score that Defendants provided to the lender (a car dealership). Plaintiff, along with other credit score purchasers, brought suit against Defendants, alleging that Defendants violated § 1681 of the FCRA, § 2 of the ICFA, and § 407.010 of the MMPA when they sold credit scores derived from a credit scoring model different from the model that they used to generate scores they

3

provide to lenders. Plaintiff also alleges that Defendants were negligent for failing to clearly inform the users that their scores were generated based on a different scoring model.

Defendants then brought the present motion to compel arbitration on an individual basis pursuant to the Service Agreement. The Service Agreement entails a broad arbitration clause which encompasses the type of dispute at issue—a cause of action arising out of a product purchase—and a waiver of class action; neither party disputes this fact. Defendants argue that Plaintiff affirmatively assented to the terms of the Agreement by clicking the Button, and therefore, the terms are binding upon Plaintiff. Defendants argue that the Court should order Plaintiff to resolve the dispute by arbitration pursuant to the arbitration clause and to arbitrate Plaintiff's claims on an individual basis pursuant to the waiver of class action in the Agreement.

Plaintiff, however, alleges that he did not assent to the terms of the Agreement by clicking the Button. He contends that the layout of the "Step 2 of 3" page was not clear enough for him to realize that he was agreeing to the terms in the Window when he clicked the Button. Thus, he argues that his clicking the Button merely constituted his assent to the terms in the Authorization Paragraph, but not to the Agreement, and therefore, the terms of the Agreement are not binding upon his claim.

## II. DISCUSSION

### A. Defendants' Motion to Compel Arbitration

#### 1. Legal Standard

Defendants seek an order compelling Plaintiff to arbitrate his claims on an individual basis pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 2. Section 2 provides that "a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any

contract." "The FAA provides for stays of proceedings in federal district courts when an issue in the proceeding is referable to arbitration, and for orders compelling arbitration when one party has failed or refused to comply with an arbitration agreement." *E.E.O.C. v. Waffle House, Inc.*, 122 S. Ct. 754, 761 (2002). A broad scope of this statute reflects Congress' intent to "respond to widespread judicial hostility to arbitration." *American Exp. Co. v. Italian Colors Restaurant*, 133 S. Ct. 2304, 2309 (2013) (citing *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1742 (2011)). However, the Supreme Court interpreted that this statute, while reflecting a "liberal federal policy favoring arbitration," embodies a "fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC*, 131 S. Ct. at 1745 (internal citations omitted).

In light of this view, in order to rule on a motion to compel arbitration based on the FAA, 9. U.S.C. § 2, the Court must first determine whether there are grounds at law or in equity for revocation of contract, including the question of "whether parties have agreed to arbitrate the dispute in question." *Granite Rock Co. v. Int'l Broth. Of Teamsters*, 130 S. Ct. 2847, 2855 (2010). The Supreme Court has emphasized this aspect in *Granite Rock*, holding that "[a]rbitration is strictly a matter of consent, and thus is a way to resolve those disputes— *but only those disputes*—that the parties have agreed to submit to arbitration." *Granite Rock*, 130 S. Ct. at 2857. Accordingly, courts should compel arbitration only when (1) a valid arbitration agreement exists between the parties and (2) absent a valid provision designating arbitration to resolve such disputes, the enforceability or applicability of arbitration to the dispute is not at issue. *Id.* at 2858. In this case, the parties do not dispute the fact that the Agreement contains an arbitration clause and a waiver for class action. The issue is whether Plaintiff accepted the Agreement by clicking the Button.

Courts—and not arbitrators—are presumed to be the decision-makers for resolving questions of contract formation and "arbitrability," (*i.e.*, whether parties are bound by a given

5

arbitration clause; whether an arbitration clause in a binding contract applies to a particular type of controversy). *Granite Rock*, 130 S. Ct. at 2856; *BG Group, PLC v. Republic of Argentina*, 134 S. Ct. 1198, 1206 (2014). When deciding whether to grant a party's motion to compel arbitration, "the court shall proceed summarily to a trial" if the formation of an arbitration agreement is in issue. 9 U.S.C. § 4. The evidentiary standard for determining whether there is a dispute on the issue of contract formation is not specified under the FAA, so courts have generally applied a standard similar to the one required for a party opposing summary judgment under Rule 56(e) of the Federal Rules of Civil Procedure. *Tinder v. Pinkerton Security*, 305 F.3d 728, 735 (7th Cir. 2002). Accordingly, a party opposing arbitration must demonstrate that there is a genuine issue of material fact warranting a trial, *i.e.*, the party must identify a triable issue of fact concerning the existence of the agreement. *Id*. Just as in a summary judgment proceeding, the evidence of the party opposing arbitration "is to be believed and all justifiable inferences are to be drawn in his favor." *Id*. However, "the party cannot generally deny the facts upon which the right to arbitration rests" but must "identify specific evidence indicating a material factual dispute for trial." *Id*.

Finally, courts must use ordinary state-law principles that govern the formation of contracts to decide whether an arbitration agreement was formed. *Janiga v. Questar Capital Corp.*, 615 F.3d 735, 742 (7th Cir. 2010) (citing *First Options of Chicago, Inc. v. Kaplan*, 115 S. Ct. 1920, 1924 (1995)). Accordingly, this Court shall look to Illinois contracts law to decide the issue. Illinois contracts law uses a basic principle of contracts to determine formation of an arbitration agreement, starting with an inquiry on whether there was an offer, acceptance, and consideration. *Crackel v. State Farm Ins. Co.*, 384 Ill. Dec. 313, 316 (2014).

A contract for sale or purchase requires mutual assent to the terms of the contract. *Forest Preserve Dist. Of Du Page County v. Brookwood Land Venture*, 229 Ill. App.3d 978, 983 (1992). To analyze whether there was mutual assent on the type of agreement in dispute,

*i.e.*, an online agreement, the Court looks to the common law which categorizes online agreements into two categories: (1) a clickwrap agreement and (2) a browsewrap agreement. The Court relies on the common law of other jurisdictions, as the Seventh Circuit has not ruled on the issue of contract formation under the particular setting of this case.

2. **"Clickwrap" and "Browsewrap" Agreements**

Here, parties dispute whether the Agreement was a valid clickwrap or browsewrap agreement, and critically, whether the layout of the "Step 2 of 3" page was conspicuous enough to provide reasonable notice to users that their clicking the Button would constitute assent to its terms. Defendants argue that placement of the Window, the Printable Version link, and the Button was conspicuous enough to provide notice to users that they are agreeing to the terms of the Agreement when they clicked the Button. Plaintiff, however, contends that the layout was rather confusing as the Authorization Paragraph—which was placed immediately above the Button—misled the users to assume that their click merely constituted assent to authorizing Defendants to obtain their information from their credit profiles.

i. **Clickwrap Agreement**

A "clickwrap" agreement is formed when website users click a button that indicates that users "agree or accept" to terms of an agreement upon viewing its terms posted on the website. *Nguyen v. Barnes & Noble*, 763 F.3d 1171, 1175-76 (9th Cir. 2014). To determine whether there was a valid clickwrap agreement, the court must determine whether users (i) had reasonable notice of the terms of a clickwrap agreement and (ii) manifested assent to the agreement. *Specht v. Netscape Communications Corp.*, 306 F.3d 17, 28-30 (2d Cir. 2002). However, courts usually enforce a clickwrap agreement because it requires users to take affirmative action to manifest assent by clicking a button or a checkbox which accompanies a statement instructing users that their click would constitute their assent to the terms at issue. *Van Tassell v. United Marketing Group, LLC*, 795 F.Supp.2d 770, 790 (N.D.Ill. 2011). *See*

7

*Newell Rubbermaid Inc. v. Storm*, No. CV 9398-VCN, 2014 WL 1266827, at *2 (Del. Ch. Mar. 27, 2014) (a valid clickwrap agreement found when (i) a box titled "Grant Terms and Agreement" stated, "[y]ou must read your Grant Agreement and review the terms to continue," (ii) an agreement was provided in a hyperlink, and (iii) a checkbox underneath the hyperlink read, "I have read and agree to the terms of the Grant Agreement."); *see also Burcham v. Expedia, Inc.*, No. 4:07CV1963 CDP, 2009 WL 586513, at *1, 3 (E.D. Mo. Mar. 6, 2009) (valid clickwrap agreements found when (i) a "Continue" button led to a page where it stated, "By continuing on you agree to the following terms and conditions," and provided the entire terms of agreement in full text, and (ii) a box stated, "I agree to the terms and conditions," while the phrase, "terms and conditions," was a hyperlink to a user agreement).

  The requirement of an explicit statement indicating that users agree to certain terms when they click a button also applies to a situation where terms of an agreement are displayed in a scrollable text window—the exact layout of the Agreement in the present case. As in other clickwrap agreements, courts have upheld an agreement whose terms are displayed in a scrollable text window if (i) users had reasonable notice of terms of the agreement and (ii) manifested their assent to such terms. *See Feldman v. Google, Inc.*, 513 F.Supp.2d 229, 236 (E.D. Pa. 2007); *see also Hancock v. American Telephone and Telegraph Co., Inc.*, 701 F.3d 1248, 1256 (10th Cir. 2012).

  In *Feldman*, the court found that users had reasonable notice of terms of an agreement in issue because (a) users did not need to scroll down to a submerged screen to see the terms, and (b) the text of the agreement was immediately visible to users as there was "a prominent admonition in boldface to read the terms and conditions carefully," with "instruction to indicate assent if [they] agree to the terms." *Feldman*, 513 F.Supp.2d at 237. At the bottom of the webpage, there was a box and statement, "Yes, I agree to the above terms and conditions." *Id*. at 238. Similarly, in *Hancock*, terms of an agreement were

8

displayed in a scrollable text box, and underneath the text box were three buttons labeled "Exit Registration," "I Reject," and "I Agree." *Hancock*, 701 F.3d at 1254. Users were required to click the button labeled, "I Agree" to proceed to the next registration page. *Id*. The court enforced the agreement as a valid clickwrap since the scrollable text box and the buttons below provided sufficient notice of the terms and indication that users accepted the terms in the box when they clicked the button. *Id*. at 1257-58.

       The question in this case is whether the Agreement in a scrollable Window was a valid clickwrap agreement, and therefore, whether Plaintiff's clicking the Button constituted his assent to terms of the Agreement. Since neither party disputes that Plaintiff clicked the Button, which is an affirmative action to accept some type of terms stated on the "Step 2 of 3" page, I only examine whether there was reasonable notice of terms of the Agreement and indication that a click would constitute assent to the terms.

       Defendants allege that the Agreement is a valid clickwrap because the placement of the Window and the Button, a visible scrollbar, and a phrase "I Accept" on the Button were conspicuous enough for users to understand that their clicking the Button would mean that they are agreeing to the terms in the Window. According to Defendants, it is impossible for users to miss the terms of Agreement because the Window was placed in the middle of the "Step 2 of 3" page and the Button was placed only a little over one inch below the Window. They also claim that the scrollbar in the Window provides sufficient notice that there is more text to be viewed within the Window. Finally, Defendants assert that, under Plaintiff's theory, the phrase on the Button must have been something other than "I Accept," since the text of the Authorization Paragraph did not ask users to "accept" anything. Plaintiff, however, contends that notice was insufficient since there was no instruction referencing the Agreement or informing users that their clicking the Button would constitute assent to the terms in the Window.

A scrollable Window in our case is similar, but critically different from the agreements in *Feldman* and *Hancock* because Defendants have not provided reasonable notice or indication that users' click would constitute their assent to the terms in the Window. I agree that the Window and the Button are quite conspicuous. It may also be true that the existence of a scroll bar automatically gives notice of terms to users. However, unlike *Feldman*, there was no text on the "Step 2 of 3" instructing users to read the terms carefully or indicating that their click constitutes assent to the terms in the Window. Defendants may contend that such an explicit statement was not required in *Hancock*. However, in *Hancock*, there was nothing in between the text window and the 'I Agree' button. Here, the Authorization Paragraph was placed in between the Window and the Button, instructing that users clicking the Button agreed to authorize Defendants to obtain their personal information. The literal text of the Authorization Paragraph was so explicit that it was reasonable for users to assume that their click merely constituted their assent to the authorization, not to the terms in the Window.

The layout of the Window, the Button, and the Paragraph may have provided reasonable notice of the existence of the terms. However, it did not provide reasonable notice that a users' click would constitute assent to the terms in the Window. Rather, the placement of the Authorization Paragraph made it confusing enough to mislead a user to assume that he was agreeing to the terms of the Authorization Paragraph. Therefore, this Agreement is not a valid clickwrap agreement.

  ii. **Browsewrap Agreement**

A "browsewrap" agreement is an agreement where users are bound to its terms by merely navigating or using a website. Michelle Garcia, *Browsewrap: A Unique Solution to the Slippery Slope of the Clickwrap Conundrum*, 36 Campbell L. Rev. 31, 35-36 (2013). They do not require users to "sign a document or click an 'accept' or 'I agree' button," so

users are considered to give assent "simply by using the website." *Nguyen*, 763 F.3d at 1176; *Van Tassell*, 795 F.Supp.2d at 790 (citing *Southwest Airlines v. BoardFirst, L.L.C.*, No. 3:06–CV–0891–B, 2007 WL 4823761, at *4 (N.D.Tex. Sept. 12, 2007)). Courts enforce browsewrap agreements only when there is actual or constructive knowledge of terms. *Id*. When there is no evidence that users had actual knowledge of terms at issue, "the validity of a browsewrap contract hinges on whether a website provided reasonable notice of the terms of the contract," *i.e.*, whether users could have completed their purchases without ever having notice that their purchases are bound by the terms. *Van Tassell*, F.Supp.2d at 790-93. In our case, neither party disputes the fact that Plaintiff lacked actual knowledge of the terms at issue, so the issue is whether Plaintiff had constructive knowledge or notice of the terms of the Agreement.

To determine whether a website provides reasonable constructive notice, courts have applied two different approaches. In the first approach, courts only look at whether hyperlinks or texts of agreements were conspicuous enough. The conspicuousness depends on design and contents of defendants' website and agreement's webpage. *Nguyen*, 763 F.3d at 1177. In *Specht*, the court refused to enforce an agreement, because its terms were placed below the "Accept" button. *Specht*, 306 F.3d at 32. The court ruled that it was not reasonable to expect that users would scroll down below the button. *Id*.

In the second approach, the recent trend in both federal district and appellate courts, courts require (i) conspicuous hyperlinks or texts of agreements and (ii) an explicit text referencing terms of agreements or instructing users that they are assenting to agreements. An additional requirement of an explicit reference is to protect users who may "have no reason to suspect [that] they will be bound" by the terms hidden in hyperlink agreements. *Nguyen*, 763 F.3d at 1179. For example, in *Van Tassel*, the court invalidated a browsewrap agreement because the webpage failed to have any reference to the Conditions of Use and also required

a multi-step process to locate the Conditions of Use. *Van Tassel*, 795 F.Supp.2d at 793. In *Zappos*, the court invalidated a browsewrap agreement where a webpage had no explicit statement directing users to the 'Terms of Use' hyperlink located between the middle and the bottom of every page. *In re Zappos.com, Inc., Customer Data Sec. Breach Lit.*, 893 F.Supp.2d 1058, 1064 (D. Nev. 2012). Finally in *Nguyen*, the Ninth Circuit invalidated a browsewrap agreement, *i.e.*, a 'Terms of Use' hyperlink placed directly below or a few inches away from the button which required users to click to proceed in a checkout process, because the website did not provide any notice to users or promote them to take any affirmative action to demonstrate their assent to the agreement. *Nguyen*, 763 F.3d at 1179. Therefore, an increasing number of courts in both federal district and appellate levels require an explicit text informing users that they are giving their assents to agreements when they navigate websites.

As a threshold matter, the Agreement lacks a primary trait of a browsewrap agreement, to wit, being bound by the terms of agreements by merely navigating the website. *See* Garcia, 36 Campbell L. Rev. at 36. Here, the enforceability of this Agreement is dependent on a user clicking the Button. Even accepting Plaintiff's argument that this Agreement may be a browsewrap agreement if the terms in the Window and terms linked to the Printable Version link are treated separately from the Button, the Agreement in our case fails to be a valid browsewrap agreement under both approaches. Under the first approach, the location of the Window and the Button, as well as the visible scroll bar may have provided sufficient notice of terms to users. However, they were insufficient to inform users that their clicks would constitute assent to the terms in the Window. Under the second approach, which provides greater protection for internet users, Defendants failed to provide constructive notice since there is no explicit reference indicating that users should read the terms in the Window. It is unreasonable to expect users to scroll down the Window when they

are not aware of a possibility of being bound by the terms in the Window. Therefore, this Agreement is not a valid browsewrap agreement because it did not provide sufficient constructive notice to users that they are being bound by the terms in the Window by using the website.

This Agreement failed to meet the thresholds for a valid clickwrap or browsewrap agreement. Therefore, I deny Defendants' motion to compel arbitration since the Agreement was not properly formed.

### B. Defendants' Rule 12(b)(3) Motion to Dismiss

Defendants move to dismiss Plaintiff's Amended Complaint arguing that all of Plaintiff's claims are subject to arbitration, and therefore, have been brought to a wrong venue. Defendants further allege that the venue was inaccurate despite the arbitration clause since the Agreement has a venue clause which requires Plaintiff to submit claims to the state and federal courts of New Castle County, Delaware, USA. However, neither the arbitration nor the venue provision is enforceable since there was no valid agreement formed. Therefore, I deny this motion.

### III. CONCLUSION

For the foregoing reasons, I deny Defendants' motion to compel arbitration and motion to dismiss Plaintiff's Amended Complaint.

ENTER:

*James B. Zagel*

James B. Zagel
United States District Judge

DATE: February 5, 2015